Adam M. Apton (State Bar No. 316506)
**LEVI & KORSINSKY LLP**
1160 Battery Street East, Suite 100 - #3425
San Francisco, CA 94111
Telephone: 415-373-1671
Facsimile: 212-363-7171
Email: aapton@zlk.com

*Counsel for Plaintiffs*

*[Additional Counsel listed on signature page]*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KARIN BAUER, ANGELA STURGES, and CHRISTIE SHINN, individually and on behalf of all others similarly situated, | **CASE NO.:** |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| PAYPAL, INC. and PAYPAL HOLDINGS, INC., | |
| Defendants. | |

     Plaintiffs Karin Bauer, Angela Sturges, and Christie Shinn (herein "Plaintiffs"), individually and on behalf of all others similarly situated, by and through her undersigned counsel, brings this Class Action Complaint against PayPal, Inc. and PayPal Holdings, Inc. (collectively, "PayPal" or "Defendants"). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to each Plaintiff, which are alleged upon personal knowledge.

## INTRODUCTION

    1.    Affiliated marketing is a cornerstone of modern digital advertising. Content creators, influencers, bloggers, and other marketers earn commissions by

promoting products and directing traffic via affiliate links (the "Affiliate Marketers").

2.     Affiliate links include unique tracking cookies or tags that identify the Affiliate Marketer as the source of the referral. Online retailers (the "Merchants") rely on tracking tags and affiliate marketing cookies to determine who gets credit for and commissions from online referrals and product sales.

3.     The commission earned by the Affiliate Marketer is often a percentage of the sale value and is critical to the income of many Affiliate Marketers.

4.     As exposed by a recent exposé,[1] the practices of the PayPal Honey browser extension undermine this system.

5.     Developed by Honey Science Corporation, Honey is a free browser extension offered to online consumers that purports to comb the Internet for coupons that can be applied to online purchases or confirm that the price the consumer sees is the best price available.

6.     On January 6, 2020, PayPal Holdings, Inc. announced that it acquired Honey Science Corporation for $4 billion—PayPal's largest acquisition to date. PayPal took full control of operations shortly thereafter and rebranded the browser extension as "PayPal Honey" in 2022.

7.     Recent estimates have found that Honey is installed on more than 20 million Google Chrome web browsers alone, making it the twelfth most popular extension for the Chrome browser.[2]

8.     Honey's purported ability to quickly price check before purchases makes the browser extension appealing to consumers looking for a discount on a product they are already interested in purchasing and have already added to their online shopping cart.

---

[1] MegaLag, *Exposing The Honey Influencer Scam*, YOUTUBE (Dec. 21, 2024), https://www.youtube.com/watch?v=vc4yL3YTwWk (last visited January 14, 2025).
[2] Matt Zeunert, *Chrome Extension Statistics: Data from 2024*, DEBUGBEAR (Aug. 29, 2024), https://www.debugbear.com/blog/chrome-extension-statistics (last visited January 14, 2025).

9.     As described in more detail throughout this Complaint, when a consumer uses an affiliate link and subsequently uses Honey to search for coupons, Honey replaces the Affiliate Marketer's cookie with its own, effectively taking credit for and any stealing any resulting commission from the sale.

10.     Plaintiffs are Affiliate Marketers whose commission payments PayPal has wrongfully misappropriated through its programming of the Honey browser extension.

11.     Plaintiffs bring this proposed consumer class action individually and on behalf of all other members of the Classes (as defined herein), for damages and injunctive relief, seeking an immediate end to PayPal's abusive practices and for recompense for the harm that has already been done.

## JURISDICTION AND VENUE

12.     This Court has original jurisdiction over all causes of action herein under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)(A), because there are more than 100 members in the proposed Classes, Defendants are citizens of a different state than at least one member of the proposed Class, and the matter in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs.

13.     This Court has personal jurisdiction over Defendants because: (1) Defendants are each a citizen of, and have their principal place of business in the state of California; (2) Defendants are authorized to do business and in fact regularly conduct and transact business in the state of California; and/or (3) the claims alleged herein took place primarily in California, where Defendants managed the operation of the Honey browser extension.

14.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391 Defendants are each a citizen of and maintain their principal place of business in this District.

**PARTIES**

15.   Plaintiff Karin Bauer is a citizen of North Carolina and resides in Lenoir, North Carolina. Plaintiff Bauer is an Affiliate Marketer and shared her affiliate links on Facebook and LinkedIn. In the past year, Plaintiff Bauer received only $100.00 in commissions for the affiliate marketing she has done.

16.   Plaintiff Angela Sturges is a citizen of Illinois and resides in Lynwood, Illinois. Plaintiff Sturges is an Affiliate Marketer and used affiliate links to promote products on warrior.com, olsp.com, and hotmart.com. In the past year, Plaintiff Sturges received only $50.00 in commissions for the affiliate marketing she has done.

17.   Plaintiff Christie Shinn is a citizen of California and resides in Glendale, California. Plaintiff Shinn is an Affiliate Marketer and used affiliate links to promote products on Amazon. Plaintiff Shinn's friends and family made purchases through Plaintiff Shinn's affiliate links, but to date, Plaintiff Shinn has not received any commissions for the affiliate marketing she has done.

18.   Defendant PayPal Holdings, Inc. is a Delaware corporation and holds all assets and liabilities of Defendant PayPal, Inc., a subsidiary Delaware corporation. The two entities are collectively referred to as "PayPal." PayPal is headquartered at 2211 North First Street, San Jose, California 95131.

19.   In addition to operating its own platform, PayPal owns and operates Honey Science Corporation, which originally developed the Honey browser extension. The term "PayPal" in this Complaint, unless otherwise noted, encompasses Honey.

**FACTUAL BACKGROUND**

**I.    The Affiliate Marketing Model**

20.   With the rise of social media and increasing popularity of platforms like YouTube, Instagram, and TikTok, Merchants have turned to Affiliate

Marketers, such as bloggers, podcasters, and influencers, to market their products to consumers.

21.     The affiliate marketing industry has grown into a massive market—in fact, it has grown 83 percent since 2017.[3] In 2023, referral marketing spending in the United States alone was approximately $9.56 billion, with likely spending of up to $15.8 billion by 2028.[4]

22.     Sales attributable to Affiliate Marketers are typically tracked through affiliate marketing cookies and/or tracking links.

23.     A cookie is a small text file that tracks a user's activity after clicking an affiliate marketer's link. The cookie stores information about the referring Affiliate Marketer and is used to determine whether the user makes a purchase. If the user does, the Affiliate Marketer receives a commission based upon that purchase.

24.     The last click attribution model, which credits the final touchpoint (or click) in the customer journey before a purchase—typically, the Affiliate Marketer's affiliate link—has emerged as an industry standard in this field.

25.     Affiliate Marketers' contractual business partners (the "Merchant Partners") regularly evaluate whether they are overperforming or underperforming regarding the Merchant Partner's benchmarks for customer acquisition. Merchant Partners track conversion rates (i.e., how many potential customers make a purchase), click-through rates, return on investment (ROI), engagement metrics, among other Key Performance Indicators (KPIs).[5]

---

[3] Charlotte Muzzi, *Affiliate Marketing Statistics You Can't Ignore in 2024*, SHOPIFY (JUL. 21, 2024) https://www.shopify.com/blog/affiliate-marketing-statistics (last visited January 14, 2025).
[4] *Affiliate Marketing 101: What it is and How to Get Started*, BIGCOMMERCE (Dec. 20, 2024), https://www.bigcommerce.com/articles/ecommerce/affiliate-marketing/ (last visited January 14, 2025).
[5] *See* Bharath Bhushan, *The 8 Most Essential Affiliate Marketing KPIs You Should Be Tracking in 2025*, WATI (Apr. 15, 2024), https://www.wati.io/blog/essential-affiliate-marketing-kpis/#:~:text=KPIs%20Measure%20Success:%20They%20allow,marketers%20make%20data%2Ddriven%20decisions (last visited January 14, 2025).

26.    If an Affiliate Marketer is overperforming on those metrics, a Merchant Partner is more likely to renew contracts with the Affiliate Marketer and offer better terms on future contracts. Conversely, if an Affiliate Marketer is underperforming, a Merchant Partner is less likely to renew contracts and offer better terms.

27.    The tracking of affiliate links therefore plays a crucial role in defining the future business relationships of Affiliate Marketers.

## II.    The Honey Browser Extension

28.    The Honey browser extension is an add-on compatible with nearly every major web browser. Adding it to a web browser is simple: by way of example, a Google Chrome user need only click "Add to Chrome" and the extension will be added:



*Figure 1 – Google Chrome Web Store page for Honey*

29.    Once added, Honey becomes an "extension" of the browser, meaning it can add or change information for the user—e.g., install cookies or tracking tags on the website.

30.    When a user shops online, the Honey extension will automatically search for and apply coupons.

31.     When a user navigates to their online shopping cart, a Honey pop-up will appear, prompting the user to apply any coupons that Honey finds:



*Figure 2 – Honey Pop-Up on Sample Online Shopping Cart*



*Figure 3 – Honey Pop-Up when No Coupons Apply*

32.     Honey will either find and apply any applicable coupons or inform the user that they already have the best price and prompt the user to continue to checkout.

7

33.    Even when Honey finds no applicable discounts, Honey generates pop-ups prompting users to checkout with PayPal or to activate cash back as part of their PayPal Rewards program.



*Figure 4 – Honey Pop-Up to Checkout with PayPal*



*Figure 5 – Honey Pop-Up to Activate PayPal Rewards*

**III.    Honey's Exploitation of Last Click Attribution and Theft of Commissions from Affiliate Marketers**

34.    Unbeknownst to Plaintiffs and members of the Classes, PayPal has been using the Honey browser extension to manipulate users' network transmissions to allow PayPal to take credit for sales commissions it did not earn.

35.    Tech influencer, Marques Brownlee, who has almost 20 million subscribers on YouTube, in his own video states that PayPal's scheme "involves almost every high-profile creator that I can think of, including myself."[6]

36.    When a user activates the Honey extension during checkout, Honey replaces tracking tags that point to Affiliate Marketers as the source of the referral with its own tracking tags. This manipulation ensures that the commission for the purchase is redirected to PayPal, even if an Affiliate Marketer's link was the original referral source.

37.    Using what is often referred to as the "developer mode" of a web browser, reading of a browser's network traffic with a Honey extension installed reveals PayPal's nefarious use of Honey to steal an Affiliate Marketer's cookie, and ultimately an Affiliate Marketer's commission.

---

[6] Ethan Baron, *PayPal accused of fraud over Honey online-shopping coupon finder*, THE KEENE SENTINEL (Jan. 10, 2025), https://www.sentinelsource.com/business/paypal-accused-of-fraud-over-honey-online-shopping-coupon-finder/article_62597e48-cca6-11ef-b5ad-b763508a27c2.html; (quoting Marques Brownlee, *The Honey Scam: Explained*, YOUTUBE (Dec. 31, 2024), https://www.youtube.com/watch?v=EAx_RtMKPm8) (last visited January 14, 2025).

38.     First, a user watches an Affiliate Marketer's video and subsequently navigates to an affiliate link for a product promoted in the video. By way of example, the following screenshots use an affiliate link from the YouTuber, Linus Tech Tips (who currently has approximately 16 million subscribers) for the Silicon Power XPower Turbine 3200MTs CL16 2x8GB DDR4 RAM (the "Product").[7]



*Figure 6 – Affiliate links in the description of an Affiliate Marketer's YouTube video*

39.     The user is redirected to the Merchant's website where the Product is being sold. The URL includes a tracking tag labelled "Short Circuit," another one of Linus Tech Tips's YouTube channels, thus tagging the potential sale as originating from Linus Tech Tips.

---

[7]   Linus Tech Tips, *The Ultimate 500 Dollar Gaming PC* (Dec. 18, 2024), https://www.youtube.com/watch?v=fGXdUp9rfHo&t=1505s (last visited January 8, 2025).



*Figure 7 – Product URL after following Affiliate Marketer's affiliate link includes Affiliate Marketer's tracking tag*

40.     The tracking tag also saves on the user's browser in the form of a cookie, which follows the transaction through to checkout. The cookie's inclusion of "Short Circuit" ensures that Linus Tech Tips is credited for and receives commission on the sale.

▼Request Payload       view source
  ▼ {page_name: "shopping cart", page_type: "shopping cart", environment_type: "desktop",…}
     ab_version: ""
     account_env: "production"
     banner_id: ""
     cm_mmc: "afc-howl-lmg%20-%20shortcircuit-jb100wvwz556j"
     cm_sp: ""
     country_code: "usa"
     currency_code: "usd"
     customer_id: ""
     device_name: "desktop"
     ec_campaign: "afc-howl-lmg - shortcircuit-jb100wvwz556j"
     environment_type: "desktop"
     event: "legacy_view"
     language_selected: "en-us"
     legacy_element_value: "header-trendingnow-_-ddr5 ram"
     login_status: "false"
     nvtc: "248326808.0001.32aaca831.1736261459.1736261459.1736261459.1"
     page_name: "shopping cart"
     page_type: "shopping cart"
     previous_page: "shopping cart"
     product_finding_methods: ""
     utm_campaign: ""
     utm_medium: ""
     utm_source: ""

*Figure 8 – Cookie identifying the Affiliate Marketer as the referral source*

41.    Enter Honey. Honey, as it is marketed, works near-instantaneously to search for and test coupon codes that may be applicable to the relevant purchase. The user is alerted to any coupon codes Honey finds, if any, and with a click of a button, can apply any codes to their shopping cart.



*Figure 9 – Honey pop-up on Merchant's website*

42.    But with that one click, unbeknownst to the user, Honey opens a hidden browser tab that removes the Linus Tech Tips tracking tag and cookie and replaces them with a PayPal tracking tag and cookie, simulating a new referral.



*Figure 10 – Honey's replacement of the Affiliate Marketer's tracking tag*

▼**Request Payload**      view source
  ▼ {page_name: "shopping cart", page_type: "shopping cart", environment_type: "desktop",…}
     ab_version: ""
     account_env: "production"
     banner_id: ""
     cm_mmc: "afc-ran-com-_-paypal%20inc."
     cm_sp: ""
     country_code: "usa"
     currency_code: "usd"
     customer_id: ""
     device_name: "desktop"
     ec_campaign: "afc-ran-com-_-paypal inc."
     environment_type: "desktop"
     event: "legacy_view"
     language_selected: "en-us"
     legacy_element_value: "header-trendingnow-_-ddr5 ram"
     login_status: "false"
     nvtc: "248326808.0001.32aaca831.1736261459.1736261459.1736261459.1"
     page_name: "shopping cart"
     page_type: "shopping cart"
     previous_page: "homepage"
     product_finding_methods: ""
     utm_campaign: ""
     utm_medium: ""
     utm source: ""

*Figure 11 – Honey's replacement of the Affiliate Marketer's affiliate cookie*

43.    Despite it being Linus Tech Tips's promotion of the Product and affiliate link that led the user to the purchase, it is PayPal that receives the commission on the sale, not Linus Tech Tips.

44.    PayPal programmed the Honey browser extension to work in this way to simulate a new referral and effectively ensure that the last click attribution goes to them. As a result, PayPal receives the entirety of the affiliate commission on the sale, stealing it away from the Affiliate Marketer who put in the heavy lifting to market the product or service.

45.    Indeed, Honey's cookie theft occurs even if Honey did not find any discounts for the product sought. The theft occurs when *any* of Honey's buttons are clicked.[8] *See Figures 2* through *5*.

## IV.    Damages and Harm

46.    Plaintiffs and Class Members were harmed by PayPal's conduct because the Honey browser extension systematically steals commission payments from their rightful owners—i.e., the Affiliate Marketer who promoted and shared the affiliate link and generated the referral and ultimate sale of a product or service.

47.    The Honey browser extension is activated during millions of online purchases each year. In the absence of the Honey browser extension, Plaintiffs and Class Members would have earned more money in the form of referral fees and sales commissions from their respective affiliate links.

48.    Plaintiffs continue to devote time and energy to content creation to generate commissions. Plaintiffs accordingly face future harm in the form of stolen referral fees and sales commissions because PayPal's Honey browser extension continues to steal affiliate marketing commissions with each referral marketing sale.

---

[8] In MegaLag's exposé, he joined the NordVPN affiliate program and purchased two subscriptions; one where he activated Honey Gold, and one without. Where he didn't use Honey, he received a $35 commission. Where he activated Honey Gold, he received 89 Honey Gold points, equivalent to $0.89. Adam Conway, *Here's how Honey managed to take affiliate revenue from creators when consumers bought products online*, XDA (Jan. 12, 2025), https://www.xda-developers.com/how-honey-affiliate-revenue-creators/ (last visited January 14, 2025).

## CLASS ACTION ALLEGATIONS

49.    Plaintiffs bring this action on behalf of herself and as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) on behalf of the following proposed Class and Subclass (collectively referred to hereinafter as the "Classes"):

**Nationwide Class ("Class"):** All persons within the United States who participated in an affiliate commission program with a United States Merchant and had commissions diverted to PayPal as a result of the Honey browser extension.

**North Carolina Subclass ("Class"):** All persons within the state of North Carolina who participated in an affiliate commission program with a United States Merchant and had commissions diverted to PayPal as a result of the Honey browser extension.

**Illinois Subclass ("Class"):** All persons within the state of Illinois who participated in an affiliate commission program with a United States Merchant and had commissions diverted to PayPal as a result of the Honey browser extension.

**California Subclass ("California Subclass"):** All persons within the state of California who participated in an affiliate commission program with a United States Merchant and had commissions diverted to PayPal as a result of the Honey browser extension.

50.    Specifically excluded from the Classes are PayPal, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by PayPal, and their heirs, successors, assigns, or other persons or entities related to or affiliated with PayPal and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

51.    Plaintiffs reserve the right to amend the Class and Subclass definitions above if further investigation and/or discovery reveals that such definitions should be expanded, narrowed, divided into further subclasses, or otherwise modified in any way.

52. The Classes satisfy the requirements of Federal Rules 23(a): numerosity, commonality, typicality, and adequacy.

53. **Numerosity**. The members of the Classes are so numerous that joinder of all members is impracticable. While the precise number of the members in each of the Classes is presently unknown, there are at least tens of thousands of members of the Class, geographically dispersed throughout the United States such that joinder of all Class Members is impracticable. There are at least thousands of members of the Subclass such that joinder of all Subclass members is likewise impracticable.

54. **Commonality**. Common questions of law and fact exist as to all members of the Classes. The common factual and legal questions include, but are not limited to, the following:

    a. Whether PayPal developed the Honey browser extension in a way that illegally usurps Class Members' commissions and sales referrals;

    b. Whether the scheme described herein results in PayPal being awarded commissions and sales referrals it did not rightfully earn;

    c. Whether PayPal was unjustly enriched to the detriment of Plaintiffs;

    d. Whether PayPal, through the actions alleged in this Complaint, violated consumer protection laws;

    e. Whether PayPal's misconduct alleged herein caused and continues to cause harm to members of the Classes;

    f. Whether Class Members are entitled to injunctive and declaratory relief; and

    g. Whether Class Members are entitled to damages and/or disgorgement of unjustly earned profits as a result of PayPal's misconduct.

55. **Typicality**. Plaintiffs' claims are typical of the claims of the other members of the Classes in that the claims of Plaintiffs and other members of the

Classes are reasonably co-extensive and arise from the same course of wrongful conduct by PayPal.

56. **Adequacy of representation**. Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs have retained counsel highly experienced in complex consumer class action litigation, and Plaintiffs intend to vigorously prosecute this action. Further, Plaintiffs have no interests that are antagonistic to those of the other members of the Classes.

57. The Class satisfies the requirements of Rule 23(b)(2) because PayPal has acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and injunctive relief with respect to Class Members as a whole.

58. The Subclass also satisfies the requirements of Federal Rules 23(b)(3): predominance and superiority.

59. **Predominance**. The common issues identified above will predominate over any questions affecting only individual Subclass Members. In particular, PayPal's liability will be determined by reference to the Terms of Service, as well as other common evidence in the form of PayPal's internal records, including financial records, and databases storing information concerning the display of every coupon code to every user, including the date of display, the identity of the user, the identity of the retailer, and the amount paid by the retailer to PayPal for the coupon code.

60. **Superiority**. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Subclass Members is relatively small compared to the burden and expense that would be involved in individual litigation of their claims against PayPal. It would, thus, be virtually impossible for the Subclass Members, on an individual basis, to obtain effective redress for the wrongs committed against them. Furthermore, individualized litigation would create the

danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single United States District Court, and presents no unusual management difficulties under the circumstances presented in this case.

61.    Alternatively, at a minimum, particular common issues are appropriate for class treatment under Rule 23(c)(4).

## CAUSES OF ACTION

### COUNT I
### UNJUST ENRICHMENT
#### (On Behalf of Plaintiffs and All Class Members)

62.    Plaintiffs, individually and on behalf of the members of the Class, incorporate by reference the allegations contained in the paragraphs above as if set forth fully herein.

63.    Plaintiffs and members of the Class lack an adequate remedy at law.

64.    Plaintiffs and members of the Class have an interest, both legal and equitable, in the commission payments wrongfully taken by Defendants. These payments were rightfully earned by Plaintiffs and Class Members, not Defendants.

65.    Substantial benefits have been conferred on Defendants by Plaintiffs and the members of the Class through the referral fees and commission payments that were credited to PayPal through the Honey browser extension wrongfully claiming credit for commissions via last click attribution.

66.    Defendants either knew or should have known that the commission payments were given with the expectation that the commission payments emanated from Plaintiffs' and Class Members' respective affiliated marketing links. As such it would be inequitable for Defendants to retain the benefit of the commissions under these circumstances.

67.    But for Defendants' unjust and improper use of the Honey browser extension, Plaintiffs and Class Members would not have had their commission payments diverted.

68.    Defendants' unjust enrichment is traceable to and resulted directly and proximately from the conduct alleged herein, including by using the Honey browser extension to wrongfully credit themselves with referrals and commissions they did not rightfully earn.

69.    Defendants continue to benefit from their wrongful practices, and profit through their use of the Honey browser extension, to the clear detriment of Plaintiffs and Class Members.

70.    The benefit conferred upon, received, and enjoyed by Defendants was not conferred officiously or gratuitously. Defendants' acceptance and retention of the benefits of the commission payments from Plaintiffs and the Class Members under the circumstances alleged herein make it inequitable and unjust for the Defendant to retain the profits and benefits for its wrongful conduct, which should be restored to Plaintiffs and Class Members.

71.    Plaintiffs and Class Members are entitled to recover from Defendants all the amounts wrongfully collected and improperly retained by the Defendants, plus interest thereon.

## COUNT II
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (On Behalf of Plaintiffs and All Members of the Class)

72.    Plaintiffs incorporate by reference the allegations contained in the paragraphs above as if set forth fully herein.

73.    Plaintiffs and Class Members are engaged in contracts or ongoing business relationships with their Merchant Partners. Plaintiffs and Class Members drive customers to merchant stores through affiliate links, and in return, Merchants provide Plaintiffs and Class Members with commission payments. These contracts and economic relationships are ongoing.

74.    Defendants knew that Plaintiffs and Class Members worked to drive customers to their Merchant Partners' websites through affiliate links. Defendants knew that Plaintiffs and Class Members received their commissions based on associated unique affiliate cookies, and that Merchants assessed the success of their affiliate partnerships based on these cookies. In short, Defendants knew these contractual and business relationships existed.

75.    Defendants intentionally disrupted Plaintiffs and Class Members' performance of their contractual and business obligations, or knew that their actions made performance more expensive, difficult, or impossible. Defendants knew that their conduct would appropriate commissions and referral fees from Plaintiffs and Class Members, thereby causing Plaintiffs and Class Members to appear to Merchant Partners to underperform relative to actual customer acquisition.

76.    Plaintiffs and Class Members were harmed by Defendants' conduct because the Honey browser extension functions to deprive them of commissions and referral fees they rightfully earned as the true drivers of the sales.

77.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members suffered economic injury by depriving them of commissions they should have earned through their affiliate links.

78.    Accordingly, Defendants are liable to Plaintiffs and Class Members for damages in an amount to be determined at trial.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNT III**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC**
**ADVANTAGE**
**(On Behalf of Plaintiffs and All Members of the Class)**

79.    Plaintiffs incorporate by reference the allegations contained in the paragraphs above as if set forth fully herein.

80.    Plaintiffs and Class Members are engaged in an economic relationship with Merchants by referring their followers to those Merchants through affiliate links. In return, Merchants provide Plaintiffs and Class Members with referral fees or commissions.

81.    Defendants have knowledge of this economic relationship.

82.    Through the use of the Honey browser extension, Defendants divert commission payments from Plaintiffs and Class Members who promoted and shared an affiliate link to generate the referral and ultimate sale of a Merchant's product or service.

83.    Defendants either intended to usurp commissions from Plaintiffs and Class Members though the conduct alleged herein or knew that its conduct would appropriate commissions and referral fees from Plaintiffs and Class Members.

84.    As a direct and proximate result of this intentional and substantial interference with the prospective economic advantage, Plaintiffs and Class Members have suffered actual damages, which includes, but is not limited to the wrongful loss of commission payments and referral fees which emanated from their affiliate links.

85.    Plaintiffs and Class Members are entitled to recover actual damages, consequential damages, punitive damages, injunctive relief, attorneys' fees, costs, and any other relief that the Court deems appropriate.

**COUNT IV**
**CONVERSION**
**(On Behalf of Plaintiffs and All Members of the Class)**

86.    Plaintiffs incorporate by reference the allegations contained in the paragraphs above as if set forth fully herein.

87.   Plaintiffs and Class Members were entitled to acquire payment commissions of concrete, readily identifiable amounts, on account of their referral codes of consumers to the products and services offered by Merchants.

88.   Defendants intentionally and substantially interfered with Plaintiffs' and Class Members' economic advantage by wrongfully replacing the cookie associated with Plaintiffs' and Class Member's with its own cookie, through the Honey browser extension. This deprived Plaintiffs and Class Members of their interest in the commission payments.

89.   Defendants, without proper justification and authorization, assumed and exercised ownership over these commission payments, in hostility to the rights of Plaintiffs and Class Members.

90.   Plaintiffs and Class Members neither assented to nor ratified Defendants' interference with their commissions.

91.   Defendants' wrongful exercise of control over Plaintiffs' and Class Members' personal property constitutes conversion.

92.   As a direct and proximate result of Defendants' conversion, Plaintiffs and Class Members were harmed as a result and will be continued to be harmed through the ongoing use of the Honey browser extension.

93.   Defendants are liable to Plaintiffs and Class Members for damages and costs permitted by law, and to injunctive relief to halt future conversion by Defendants through their ongoing conduct.

# COUNT V
# VIOLATION OF NORTH CAROLINA UNFAIR TRADE PRACTICES ACT
## N.C. Gen. Stat. Ann. §§ 75-1.1, *et seq.*
## (On Behalf of Plaintiff Bauer and the North Carolina Subclass)

94.    Plaintiff Bauer incorporates by reference the allegations contained in the paragraphs above as if set forth fully herein.

95.    Defendants advertised, offered, or sold goods or services in North Carolina and engaged in commerce directly or indirectly affecting the people of North Carolina, as defined by N.C. Gen. Stat. Ann. § 75-1.1(b).

96.    Defendants engaged in unfair and deceptive acts and practices in or affecting commerce, in violation of N.C. Gen. Stat. Ann. § 75-1.1, including their practices relating to the Honey browser extension's replacing of Plaintiff Bauer's and North Carolina Subclass Members' affiliate cookie with their own to divert Plaintiff Bauer's and North Carolina Subclass Members' commission payments to themselves.

97.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about who their purchases were benefitting. Consumers are unaware that their actions benefit Defendants at the expense of Affiliate Marketers.

98.    Defendants acted intentionally, knowingly, and maliciously to violate North Carolina's Unfair Trade Practices Act, and recklessly disregarded Plaintiff Bauer's and North Carolina Subclass Members' rights.

99.    As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff Bauer and North Carolina Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including loss of their earned commission payments and referral fees.

100.    Defendants' conduct as alleged herein was continuous, such that after the first violations of the provisions pled herein, each week that the violations continued constitute separate offenses pursuant to N.C. Gen. Stat. Ann. § 75-8.

101.    Plaintiff Bauer seeks all monetary and non-monetary relief allowed by law, including actual damages, treble damages, and attorneys' fees and costs.

**COUNT VI**
**VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE**
**BUSINESS PRACTICES ACT**
**815 Ill. Comp. Stat. §§ 505,** *et seq.*
**(On Behalf of Plaintiff Sturges and the Illinois Subclass)**

102.    Plaintiff Sturges incorporates by reference the allegations contained in the paragraphs above as if set forth fully herein.

103.    Defendants are each a "person" as defined by 815 Ill. Comp. Stat. §§ 505/1(c).

104.    Plaintiff and Illinois Subclass Members are each a "consumer" as defined by 815 Ill. Comp. Stat. §§ 505/1(e).

105.    Defendants' conduct as described herein was in the conduct of "trade" or "commerce" as defined by 815 Ill. Comp. Stat. § 505/1(f).

106.    Defendants' deceptive, unfair, and unlawful trade acts or practices, in violation of 815 Ill. Comp. Stat. § 505/2, include their practices relating to the Honey browser extension's replacing of Plaintiff Sturges' and Illinois Subclass Members' affiliate cookie with their own to divert Plaintiff Sturges' and Illinois Subclass Members' commission payments to themselves.

107.    Defendants' acts and practices had, and continue to have, the tendency or capacity to deceive, in that consumers are unaware that their actions benefit Defendants at the expense of Affiliate Marketers.

108.    The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury that these consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

109.    Defendants acted intentionally, knowingly, and maliciously to violate Illinois's Consumer Fraud Act, and recklessly disregarded Plaintiff Sturges' and Illinois Subclass Members' rights.

110.    As a direct and proximate result of Defendants' unfair, unlawful, and deceptive acts and practices, Plaintiff Sturges and Illinois Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to loss of their earned commission payments and referral fees.

111.   Plaintiff Sturges seeks all monetary and non-monetary relief allowed by law, including damages, restitution, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

**COUNT VII**
**VIOLATION OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**815 Ill. Comp. Stat. §§ 510/1, *et seq.***
**(On Behalf of Plaintiff Sturges and the Illinois Subclass)**

112.   Plaintiff Sturges incorporates by reference the allegations contained in the paragraphs above as if set forth fully herein.

113.   Defendants are each a "person" as defined by 815 Ill. Comp. Stat. §§ 510/1(5).

114.   Defendants engaged in deceptive trade practices in the conduct of its business, in violation of 815 Ill. Comp. Stat. §§ 510/2(a), including their practices relating to the Honey browser extension's replacing of Plaintiff Sturges' and Illinois Subclass Members' affiliate cookie with their own to divert Plaintiff Sturges' and Illinois Subclass Members' payments to themselves.

115.   Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about who their purchases were benefitting. Consumers are unaware that their actions benefit Defendants at the expense of Affiliate Marketers.

116.   The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff Sturges and Illinois Subclass Members that they could not

reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

117.    As a direct and proximate result of Defendants' unfair, unlawful, and deceptive trade practices, Plaintiff Sturges and Illinois Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including loss of their earned commission payments and referral fees.

118.    Plaintiff Sturges seeks all relief allowed by law, including injunctive relief.

## COUNT VIII
## VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17045
### (On Behalf of Plaintiff Shinn and the California Subclass)

119.    Plaintiff Shinn incorporates by reference the allegations contained in the paragraphs above as if set forth fully herein.

120.    Section 17045 prohibits the "secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchasers special services or privileges not extending to all purchasers purchasing upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition."

121.    By secretly and unlawfully replacing the cookie associated with Plaintiff Shinn and California Subclass Members with their own cookie, Defendants ensured that they would be paid "secret . . . commissions" by Merchants, to the detriment of competition.

122.   This payment of secret commissions has directly harmed Plaintiff Shinn and California Subclass Members because the secret commissions themselves represent the diversion of Plaintiff Shinn and California Subclass Members' earnings to Defendants. Such secret payment of commissions, to the direct detriment of Defendants' competitors in affiliate marketing, is injurious to Defendants' competitors, including Plaintiff Shinn and California Subclass Members, tends to destroy competition, and is unlawful.

### COUNT IX
### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
#### Cal. Bus. & Prof. §§ 17200 *et seq.*
#### (On Behalf of Plaintiff Shinn and California Subclass Members)

123.   Plaintiff Shinn, individually and on behalf of others similarly situated, incorporates by reference the allegations contained in the paragraphs above as if set forth fully herein.

124.   The Unfair Competition Law prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

125.   Defendants are each a "person" under Cal. Bus. & Prof. Code § 17201.

126.   Defendants have engaged in acts and practices that are unlawful, unfair, and fraudulent in violation of the UCL.

127.   **Unlawful.** As alleged herein, Defendants' use of the Honey browser extension to steal credit for sales referrals and commission payments from those sales violate multiple laws, including at least Cal. Bus. & Prof. § 17045 and the laws prohibiting conversion and interference with prospective economic advantage.

128.   **Fraudulent.** Defendants' scheme is likely to deceive not only the Affiliate Marketers but the public, in that consumers are unaware that their actions benefit Defendants at the expense of Affiliate Marketers.

129.   **Unfair.** Defendants committed unfair practices by its immoral, unethical, oppressive, anticompetitive, and unscrupulous acts and practices which interfered with the prospective economic advantage of Affiliate Marketers.

130. Defendants' wrongful conduct with respect to its practices relating to collection of referral fees and commission payments, violated California's public policy against interfering with another's prospective economic advantage.

131. Defendants' conduct with respect to its practices is unscrupulous, offensive, and substantially injurious to the consumers and the utility of Defendants' conduct, if any, does not outweigh the gravity of the harm to its victims.

132. Defendants wrongfully deprive Plaintiff Shinn and California Subclass Members of monies they rightfully earned as the true originators of sales arising from their affiliate links.

133. Defendants actually and proximately caused harm to Plaintiff Shinn and California Subclass Members in that, among other things, they suffered economic injury by being deprived of commissions they should have earned from referrals through their affiliate links.

134. Defendants' conduct is ongoing and continuing, and there is no indication that Defendants will cease such activity in the future, such that prospective injunctive relief is necessary.

135. Additionally, Plaintiff Shinn seeks restitution if monetary damages are not available. Indeed, restitution under the UCL can be awarded in situations where the entitlement to damages may prove difficult. But even if damages were available, such relief would not be adequate to address the injury suffered by Plaintiff Shinn and the California Subclass. Unlike damages, the Court's discretion in fashioning equitable relief is broad. Thus, restitution would allow recovery even when normal consideration associated with damages would not.

136. On behalf of herself and the California Subclass, Plaintiff Shinn also seeks all other appropriate relief in equity, including reasonable attorneys' fees and costs of suit. This Complaint will be amended at a later time after the requisite statutory period for a response has expired.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

(a)  An order declaring this action to be a proper class action, appointing Plaintiffs and their counsel to represent the Classes, and requiring Defendants to bear the costs of class notice;

(b)  An order enjoining Defendants;

(c)  An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendants from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendants' past conduct;

(d)  An order requiring Defendants to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be unlawful, unfair, or fraudulent business act or practice, or a violation of law, plus pre- and post-judgment interest thereon;

(e)  An order requiring Defendants to disgorge or return all moneys, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

(f)  An order requiring Defendants to pay all actual and statutory damages permitted under the counts alleged herein, in an amount to be determined by this Court, but at least $5,000,000;

(g)  An order requiring Defendants to pay punitive damages on any count so allowable;

(h)  An order awarding attorneys' fees and costs to Plaintiffs and the Classes; and

(i)  An order providing for all other such equitable relief as may be just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of all issues so triable.

Dated: January 16, 2025                    Respectfully submitted,

                                            **LEVI & KORSINSKY LLP**

                                            By: */s/ Adam M. Apton*
                                            Adam M. Apton (State Bar No. 316506)
                                            1160 Battery Street East, Suite 100 - #3425
                                            San Francisco, CA 94111
                                            Telephone: 415-373-1671
                                            Facsimile: 212-363-7171
                                            Email: aapton@zlk.com

                                            Mark S. Reich*
                                            Courtney E. Maccarone*
                                            Colin A. Brown*
                                            Alyssa Tolentino*
                                            **LEVI & KORSINSKY, LLP**
                                            33 Whitehall Street, 17th Floor
                                            New York, NY 10004
                                            Telephone: (212) 363-7500
                                            Facsimile: (212) 363-7171
                                            Email: mreich@zlk.com
                                            Email: cmaccarone@zlk.com
                                            Email: cbrown@zlk.com
                                            Email: atolentino@zlk.com

                                            *Counsel for Plaintiffs*

                                            **pro hac vice* forthcoming